UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **GAIL MOORHOUSE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-129 (RBW) |
| | ) | |
| **JAMES BILLINGTON,** | ) | |
| **Librarian of Congress** | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This action alleges violations under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16 (2004). The plaintiff seeks declaratory and injunctive relief, as well as monetary damages on her claims of discrimination based on retaliation. Plaintiff's Complaint For Damages ("Compl.") ¶ 4. Currently before the Court is Defendant's Motion for Summary Judgment [D.E. # 23], the plaintiff's opposition thereto, and the Defendants Reply in Support of His Motion for Summary Judgment ("Def.'s Reply"). For the following reasons, the defendant's motion will be granted.

**I. Factual Background**

The facts of this case have been fully recited in the Court's previous Memorandum Opinion issued on April 14, 2005, granting in part and denying in part, the Library of Congress' ("Library") motion to dismiss. Thus, the Court need not engage in an extensive review of the facts; however, it is helpful to review the facts as they relate to the motion currently before the Court.

The plaintiff has remained in her current position with the Library as a GS-11 Program Specialist in the Human Resources Services division of the Library throughout the time this case has been pending before the Court. Defendant's Statement of Material Facts as to Which There is No Genuine Dispute ("Def.'s SOF") ¶ 1; Compl. ¶ 10. As a Program Specialist, the "[p]laintiff's duties included handling the Voluntary Leave Transfer Program, the advanced sick leave program, performing leave audits, dealing with payroll issues and assisting Library employees who called or walked into the plaintiff's office with questions." Def.'s SOF ¶ 2. The plaintiff first requested in July 1998 that she be permitted to work at home two days per week to care for her father. Id. ¶ 6 (citing Exhibit ("Ex.") 1 (Deposition Transcript of Gail M. Moorhouse ("Moorhouse Tr.") dated October 26, 2005)) at 10:23-25; 11:1; 29:3-9. From July 1998 through February 28, 2001, the plaintiff submitted and had approved several requests that she be permitted to work at home. Id. at ¶¶ 7-14. The plaintiff submitted a request to continue her at home work schedule on November 7, 2000, which was also approved by the Director of Human Resources; however, the approval contained a specific directive that "Gail must return from work at home on March 1 [2001]." Id. ¶ 14 (citing Ex. 1 (Moorhouse Tr.)) at 34:4-6; Ex. 3 (Authorization for Library Staff to Work at Place of Residence dated October 13, 2000)). Despite this directive, the plaintiff submitted another work at home request on February 20, 2001. Id. ¶ 15 (internal citations omitted). On March 5, 2001, the plaintiff's direct supervisor at that time (Herb Junious) supported the plaintiff's request and recommended that she continue working her modified work schedule. Compl. ¶ 14. This request, however, was disapproved by Junious' supervisor, Nora Bardak ("Bardak"). Def.'s SOF ¶ 15 (citing Ex. 4 (Authorization for Library Staff to Work at Place of Residence dated February 28, 2001)). Although Junious never

received authorization from Bardak, he continued to allow the plaintiff to work her modified schedule until his retirement in June 2001.[1]  Compl. ¶ 15.  In June 2001, after Junious retired, Gloria Duarte became the plaintiff's immediate supervisor and she initially allowed the plaintiff to continue working her modified work schedule.  Id. ¶ 17.

On June 29, 2001, the plaintiff filed an administrative complaint with the Library's Equal Employment Opportunity Complaints Office ("EEO"), wherein she claimed that Bardak had denied her modified work schedule request.  Def.'s Mem. at 3 (citing Ex. 11 (EEO Complaint of Discrimination)).  Three days later, on July 2, 2001, the Library's Inspector General's Office received an anonymous hotline complaint regarding the plaintiff's work schedule.  Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n") at 7; Def.'s SOF ¶ 16 (citing Ex. 5 (Hotline Complaint)).  The complaint was labeled as urgent and stated that the "[Library of Congress] need[ed] to investigate Gayle Moorhouse's [sic] - HR Time - she is absent and does not use leave - unusual (or not) for someone in payroll?"  Pl.'s Opp'n at 7.  In response to the anonymous hotline tip, the Inspector General's office initiated an inquiry into the allegations.  Def.'s SOF ¶ 17.

According to the plaintiff, later in July 2001, Bardak formally disallowed the plaintiff's modified work schedule.  Compl. ¶ 18.  However, the plaintiff continued to work the adjusted schedule after its disallowance, which ultimately resulted in Bardak declaring her as absent-without-leave ("AWOL") for one day on August 16, 2001.  Id. ¶ 19; Def.'s SOF ¶ 18 (citing Ex.

---

[1] The Court notes that the plaintiff's February 28, 2001 request to continue working at home was denied by Bardak, but Bardak's signature is not dated.  Def.'s Mem, Ex. 4 (Authorization for Library Staff to Work at Place of Residence denied by Ms. Bardak).  The plaintiff claims that Bardak formally denied her request in July 2001.  Compl. ¶ 18.  However, the Library contends that the February 28, 2001 request and Junious' support of the request does not negate Bardak's disapproval.  Defendant's Reply in Support of His Motion for Summary Judgment ("Def.'s Reply") at 7.  The Library contends that the plaintiff continued to work at home despite the fact that she was on notice as early as November 2000 that her authorization to work at home would expire in February 2001.  Id. at 6-7.

1 (Moorhouse Tr.)) at 101:19-102:9. On August 27, 2001, the Inspector General concluded its investigation and found that the plaintiff had received credit and compensatory hours without authorization, continued to work at home without authorization after February 28, 2001, and used 138 hours of unauthorized leave over the course of five pay periods. Def.'s Mem. at 4 (citing Ex. 7 (Memorandum from Inspector General to Teresa Smith, Director, Human Resources Services, regarding Time and Attendance Review, dated August 27, 2001)). Consequently, the Inspector General recommended that Human Resources Services take disciplinary action against the plaintiff. Id. Bardak informed the plaintiff about the investigation on that same day. Der.'s Mem. at 4, and her access to the National Finance Center ("NFC") database, including access to the personnel/payroll/time and attendance system, was cancelled. Def.'s Reply at 5 (citing Ex. A (Memorandum from Security Officer to Teresa Smith, Director, Human Resources Services regarding NFC Access for Gail Moorhouse dated August 24, 2001)). On September 10, 2001, the Inspector General issued a second memorandum to the Human Resources Services, again recommending that disciplinary action be taken against the plaintiff. Def.'s Mem. at 4. On November 1, 2001, the plaintiff filed a second EEO complaint alleging that Bardak, along with the Director of Human Resources (Teresa Smith), discriminated against her "based on race, national origin, disability and reprisal." Compl. ¶ 20; Pl.'s Opp. at 7 & Ex. 9 ("Library of Congress – Equal Opportunity . . . Complaint of Discrimination," dated November 1, 2001). Subsequently, on November 8, 2001, based on the Inspector General's findings and recommendation, Bardak issued a Notice of Proposed Adverse Action ("Notice") against the plaintiff and proposed that she be separated from the Library. Def.'s Mem. at 4; Pl.'s Opp. at 7. Ultimately, Smith issued a final decision on the plaintiff's fate and mitigated the proposed

separation to a 10-day suspension and reassignment to her current position as a Program Specialist.  Def.'s Mem. at 5 (citing Ex. 10 (Undated Letter to Moorhouse from Teresa Smith, Director Human Resources Services)).

This lawsuit was initiated by the plaintiff against the Library on January 28, 2004.  The Library then moved to dismiss the plaintiff's complaint and this court granted that motion in part and denied it in part.  See Order dated March 30, 2006.  Specifically, the Court granted the Library's motion with the respect to the plaintiff's Title VII claim for race discrimination and her Rehabilitation Act of 1973 discrimination claim.  Id.  However, the Court denied the Library's motion with respect to the plaintiff's Title VII claim for retaliation.  Id.  The Library now moves for summary judgment on the plaintiff's claim of retaliation.

## II. Standard of Review

### A. Summary Judgment

Granting summary judgment is appropriate when there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Id. at 255.  The entry of summary judgment is appropriate after there has been an "adequate time for discovery . . . [and the] party [against whom the motion has been filed] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Summary judgment "is a drastic remedy, [and therefore] courts should grant it with caution so that no person will be deprived of his or her day in court to prove a disputed material factual issue." Greenberg v. Food & Drug Admin., 803 F.2d 1213, 1216 (D.C. Cir. 1986). Summary judgment is accordingly not appropriate, for example, where "the evidence presented on a dispositive issue is subject to conflicting interpretations, or reasonable persons might differ as to its significance . . . ." Id. (citations omitted). Moreover, when reviewing the evidence, the Court must draw "all inferences . . . in favor of the nonmoving party[.]" Coward v. ADT Sec. Sys., Inc., 194 F.3d 155, 158 (D.C. Cir. 1999); Aka v. Washington Hosp. Ctr, 156 F.3d 1284, 1295 (D.C. Cir. 1998). Here, for the plaintiff "to survive summary judgment [she] must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory [or retaliatory] reason." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (citing Aka, 156 F.3d at 1290).

> **B.    The Plaintiff's Title VII Retaliation Claim**
>
> **1.    The Plaintiff's Prima Facie Case**

"Title VII's anti-retaliation provision forbids 'discriminat[ion] against' an employee or job applicant who, inter alia, has 'made a charge, testified assisted, or participated in' a Title VII proceeding or investigation." Burlington N. and Santa Fe Ry. Co. v. White, ___ U.S. ___, ___ , S. Ct. 2405, 24 06 (2006) (quoting 42 U.S.C. § 2000e-3(a)). Evaluation of Title VII retaliation claims follows the same burden-shifting template as discrimination claims. Cones v. Shalala, 199 F.3d 512, 520 (D.C. Cir. 2000). Therefore, "the plaintiff must first establish a prima facie case; if [s]he meets that burden, the employer must articulate a legitimate non-retaliatory reason for its action; finally, the plaintiff has the ultimate burden of establishing that the reason asserted by the

6

employer is pretext for retaliation." Id. (citation omitted). "The plaintiff's burden" of establishing a prima facie case of retaliation "is not great[.] [T]he plaintiff 'merely needs to establish facts adequate to permit an inference of retaliatory motive.'" Sullivan-Obst v. Powell, 300 F. Supp. 2d 85, 92 (D.D.C. 2004) (quoting Forman v. Small, 271 F.3d 285, 299 (D.C. Cir. 2001)). "To establish a prima facie case of retaliation, the plaintiff must present evidence that (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) the adverse action was causally related to the exercise of her rights." Holcomb v. Powell, 433 F.3d 889, 901-02 (D.C. Cir. 2006) (citing Forkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002); Brown v. Brody, 199 F.3d 446, 452-53 (D.C. Cir. 1999)). The Library contends that the plaintiff cannot establish a prima facie case of retaliation, nor can she rebut its articulated reasons for actions against her as pretextual. Def.'s Mem. at 8. On the other hand, the plaintiff takes exception with both positions. Pl.'s Opp'n at 8. First, the plaintiff asserts that she engaged in protected activity when she filed her EEO complaints on June 29, 2001, claiming discrimination and again on November 1, 2001 alleging retaliation. Id. at 8-9. And, there is no dispute that the plaintiff engaged in protected activity when she filed the two EEO complaints against the Library. Baker v. Potter, 294 F. Supp. 2d 33, 41 (D.D.C. 2003) ("[p]laintiff certainly engaged in statutorily protected activity when she filed her EEO complaints . . . .").

With respect to second prong of her prima facie case of retaliation, the plaintiff asserts that the Library took adverse actions against her when (1) she was removed from the payroll office; (2) relieved of her duties as a liaison with the NFC; and (3) when she received a Notice of

Proposed Adverse Action that recommended her separation from the Library. Pl.'s Opp'n at 9.[2] The plaintiff additionally claims that Ms. Bardak falsely claimed that she worked additional compensatory and credit hours without prior documented approval. Id.[3] The defendant admits that the plaintiff has satisfied the second prong of her prima facie case of retaliation. Def.'s Mem. at 14. Specifically, that the Notice of Proposed Adverse Action recommending her suspension from the Library "caused her to lose ten-days' pay," and thus was an adverse employment action. Id.

However, the Library opines that the plaintiff cannot establish the third prong of her prima facie case of retaliation – a causal connection between the protected activity and the adverse employment action – because "there is no evidence in the record that "the [p]laintiff's supervisors were even aware of her November EEO filing." Id. On the other hand, the plaintiff alleges that a causal connection existed between the protected activity and the asserted adverse actions. Pl.'s Opp'n at 9. Specifically, within weeks of filing her EEO Complaint the plaintiff was removed from the payroll office and her duties as a liaison with the NFC were taken away. And, within a week after filing her second EEO complaint, the plaintiff received a Notice of Proposed Adverse Action from Bardak seeking her separation from the Library after thirty years of service. Id. at 9-10.

---

[2] The plaintiff also alleges that the Library took adverse actions against her when the Library's Inspector General's Office received an anonymous hotline complaint regarding her work schedule. Pl.'s Opp'n at 9. Although the plaintiff infers that the Library is responsible for initiating this complaint, there is no evidence in the record to support this inference. Accordingly, the hotline complaint cannot be considered as an adverse employment action attributable to the Library.

[3] The plaintiff originally asserted an additional claim that her supervisor (Nora Bardak) retaliated against her by declaring her absent without leave on August 16, 2001. See Plaintiff's Opposition to Defendant's Motion to Dismiss at 7. However, the plaintiff does not address this allegation in her current opposition to the defendant's motion for summary judgment as an adverse employment action that would support a prima facie case of retaliation.

Turning to whether a causal connection exists between the adverse employment actions and the plaintiff's protected activity, the Court concludes that such a connection does exist. Indeed, the District of Columbia Circuit has long held that "'a causal connection . . . may be established by showing that the employer had knowledge of the employee's protected activity, and that the . . . adverse action took place shortly after that activity.'" Rochon v. Gonzales, 438 F.3d 1211, 1220 (D.C. Cir. 2006) (quoting Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985). ("The causal connection component of the prima facie case may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity")); Holcomb, 433 F.3d at 903. To prove knowledge by the employer, the "[p]laintiff merely needs to establish facts adequate to permit an inference of retaliatory motive." Milliner v. District of Columbia, 932 F. Supp. 345, 352 (D.D.C. 1996) (quoting Mitchell, 759 F.2d at 86 (quoting in part McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984)). "To qualify as a causal connection, however, the temporal proximity between the employer's knowledge of the protected activity and the adverse personnel action must be 'very close.'" Baker v. Potter, 294 F. Supp. 2d 33, 41 (D.D.C. 2003) (quoting Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)) (noting that an adverse employment action that occurs three or four months after a protected activity is not temporally close enough to show a causal connection)); but see Buggs v. Powell, 293 F. Supp. 2d 135, 149 (D.D.C. 2003) ("[A] two-month time span between the protected activity and the purported act of retaliation is sufficiently temporal in proximity to give rise to an inference of discrimination.") (citation omitted).

Here, there is no dispute that the plaintiff's supervisors were aware of her June 29, 2001 EEO complaint. And it is this complaint which the plaintiff claims resulted in a series of adverse actions. Moreover, prior to the filing of the plaintiff's June 29, 2001 EEO Complaint, the plaintiff had worked at the Library for 28 years and had an exemplary performance record, with no prior allegations of misconduct. Def.'s Mem., Ex. 13 (Letter to Moorhouse from Director of Human Resources Services). It was only after her first EEO complaint was filed that she began to experience the adverse employment actions. Specifically, within three days of filing her first EEO Complaint the Inspector General initiated an investigation into the plaintiff's payroll records, as a result of an anonymous tip on July 3, 2001. The next month, on August 16, 2001, the plaintiff had one day's pay forfeited for being away from the workplace without leave.[4] Within the next two weeks the plaintiff was removed from the payroll office and her duties as a liaison with the NFC were taken away. Finally, in November, 2001, the plaintiff received a Notice of Proposed Adverse Action recommending her separation from the Library. Thus, the proximity in time between the filing of the EEO complaint and these subsequent events is sufficient to establish a causal connection. See e.g., Cones, 199 F.3d at 521 ("[G]iven the circumstances of this case, the close temporal proximity of [the plaintiff's] discrimination complaints to the refusal to consider him for the . . . position is sufficient to establish a causal connection."); Mitchell, 759 F.2d at 86-87 (causal connection established when the plaintiff experienced a series of negative personnel actions within weeks of filing an EEO complaint).

---

[4] Although the plaintiff originally asserted an additional claim that her supervisor (Nora Bardak) retaliated against her by declaring her absent without leave on August 16, 2001, she does not address this allegation in her current opposition to the defendant's motion for summary judgment as an adverse employment action that would support a prima facie case of retaliation. Nonetheless, a loss of one-day's salary for being away from the workplace without leave can be viewed as an adverse action that occurred within a series of adverse actions against the plaintiff that supports a causal connection.

Accordingly, the plaintiff has established a causal connection between her protected activity and an adverse employment action, thereby establishing a prima facie case of retaliation.

### 2.     The Defendant's Legitimate Non-Discriminatory Explanation

When a plaintiff establishes a prima facie case of retaliation, "as with the traditional order of proof in Title VII discrimination cases, the burden then shifts to defendant to articulate a legitimate, nondiscriminatory reason for the alleged acts of reprisal." Milliner, 932 F. Supp. at 352 (quoting McKenna, 729 F.2d at 790). "The plaintiff is then given the opportunity to prove that the reason articulated by the defendant is a pretext for discrimination." Id. Here, the Library has produced evidence that the reason the plaintiff was subjected to adverse employment actions was because she "had engaged in misconduct in the form of earning credit and compensatory hours without authorization and [for] le[aving] her office without coverage." Def.'s Mem. at 12. Specifically, as a result of an anonymous hotline complaint to the Inspector General's Office reporting possible misconduct by the plaintiff and one of her colleagues, an investigation was initiated on July 3, 2001. Id. at 11 (citing Ex. 5 (Anonymous Hotline Complaint)).[5]  As a result of the investigation, the Inspector General issued a report on August 27, 2001, finding that the plaintiff had engaged in misconduct by " earning credit and compensatory hours without authorization. Id. at 11-12 (citing Ex. 7 (August 27, 2001 Memorandum from Inspector General to Director, Human Resources Services indicating that the plaintiff earned credit and compensatory hours and worked at home without authorization)). The report recommended that appropriate disciplinary action be taken against the plaintiff. Id.  The Inspector General issued a

---

[5] The Office of the Inspector General ("OIG") is the Office within the Library that performs audits of Library programs and investigates allegations of fraud, waste, or abuse against Library management and staff.  This office receives allegations in various forms, one being through the anonymous OIG "hotline." Def.'s Mem., Ex. 6 (Declaration of Nicholas G. Christopher, Assistant Inspector General of the Library's OIG dated June 27, 2006).

11

second report on September 10, 2001, finding that the plaintiff and other employees had committed additional time and attendance infractions. Id. at 13 (citing Ex. 8 (Memorandum from Inspector General to Director, Human Resources Services dated September 10, 2001)). The September 10, 2001 memorandum also recommended that the Director "consult with Labor Relations about disciplinary action against Ms. Moorhouse." Id. Based on the Inspector General's recommendations, the plaintiff's supervisors took disciplinary action against her. Id. at 14. Specifically, during the Inspector General's investigation, the plaintiff was removed from the payroll office and her duties as a liaison with the NFC were relinquished. This action was taken because the plaintiff was found to have violated certain Library policies and therefore could not remain in a position of trust with access to sensitive information about Library employees. Def.'s Reply at 5 (citing Ex. A (Memorandum from Director, Human Resources Services to Security Officer terminating access to the personnel/payroll, time and attendance system for Gail Moorhouse)). Additionally, the plaintiff's supervisor issued a Notice of Proposed Adverse Action against the plaintiff recommending her separation from the Library. However, this proposal was reconsidered and the plaintiff ultimately was suspended for ten days without pay and was reassigned. Surely these explanations amount to legitimate, nondiscriminatory reasons for the actions taken by the Library. See e.g., Taylor v. Wash. Metro. Area Transit Auth., 922 F. Supp. 665, 673 (D.D.C. 1996) (defendant produced legitimate non-discriminatory explanation for adverse personnel action where it found plaintiff to have committed a serious violation of its "rules of conduct"); Slade v. Billington, 700 F. Supp. 1134 (D.D.C. 1988) (Library of Congress provided a legitimate, non-discriminatory reason for the issuance of proposed adverse action against employee where he had violated clearly defined personnel policy).

### 3.     Was the Defendant's Explanation Pretext for Discrimination?

When the defendant proffers an explanation for its actions worthy of credence, the plaintiff must then show by a preponderance of the evidence that the defendant's asserted legitimate reason is a "pretext" for discrimination, by either a direct showing that it was highly probable that the defendant was motivated by discrimination or by an indirect showing that the defendant's reason is pretextual.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); see also Forman v. Small, 271 F.3d 285, 292 (D.C. Cir. 2001) (citing Cuddy v. Carmen, 762 F.2d 119, 122 (D.C. Cir. 1985)).  And "a reason cannot be proved to be 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphases in original).  Here, notwithstanding the plaintiff's prima facie case of retaliation, she has failed to offer any evidence to rebut the Library's legitimate non-discriminatory explanation for the adverse employment actions taken against her.  Absent such evidence, the Library is entitled to summary judgment on the plaintiff's Title VII retaliation claim.

### IV.  Conclusion

For the reasons set forth above, this Court concludes that the plaintiff cannot sustain a claim of retaliation against the Library.  Accordingly this Court grants the defendant's motion for summary judgment.[6]

**SO ORDERED** on this 15th day of December, 2006.

REGGIE B. WALTON<br>
United States District Judge

---

[6] An Order consistent with this Memorandum Opinion is being issued contemporaneously herewith.